UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
DEBRA LAWSON,

               Plaintiff,

        - against -

THE CITY OF NEW YORK, JAMES COAN, as
Captain, formerly assigned to the Organized Crime
Control Bureau's Firearm Suppression Unit;
DANIEL DAVIN, as Lieutenant, Organized Crime
Control Bureau's Firearm Suppression Unit; and
PATRICK ACRI, as Sergeant, formerly assigned to
Organized Crime Control Crime Bureau's Firearm
Suppression Unit, being sued Individually and in
His official capacity as an employee of Defendant
THE CITY OF NEW YORK,

               Defendants.
-------------------------------------------------------- x

**MEMORANDUM OF DECISION**

10 CV 5238 (RJD) (CLP)

DEARIE, District Judge.

      By any reasonable measure, plaintiff Debra Lawson has enjoyed a very successful career in the New York City Police Department. First hired in 1994, she quickly moved to undercover work in only three years when she received very favorable evaluations and advancements. In only four years she was promoted to Detective Third Grade and with high praise from her superiors, she was promoted again in 2005 to Detective Second Grade. But sometime in 2008, criticism arose over plaintiff's inability to perform her assigned investigative duties. Ms. Lawson acknowledges that some of the criticism is accurate, but she nevertheless alleges that her career has stalled due to race and sex discrimination and that defendants have retaliated against her for her complaints about her assignments and alleged loss of overtime. This Court's review of the record does not, however, identify an issue for trial.

There is no evidence of discrimination in this case. By any standard, plaintiff has enjoyed a successful career at the NYPD, marked by several promotions and increases in salary. She concedes that has never been subjected to any name-calling or hostility because of her race or gender. And contrary to plaintiff's allegations, the only evidence before us suggests that race and gender were not a factor in defendants' decisions, which appear to be logical responses to plaintiff's documented shortcomings. Accordingly, defendants' motion for summary judgment is granted.

# I. BACKGROUND[1]

Plaintiff Debra Lawson's career with the NYPD began nearly twenty years ago, when she was hired as a police officer in 1994. ECF Docket # 54, Ex.17, Pl.'s 56.1 Stmt. ¶ 2. Three years later, she transitioned to the role of undercover police officer, purchasing firearms and drugs undercover for the Organized Crime Control Bureau's Firearms Investigation Unit. Id. ¶ 3. Plaintiff received two promotions as an undercover police officer; she advanced to Detective, Third Grade, in November 1998, and Detective, Second Grade, in April 2005. Id. ¶ 4.

## A. Plaintiff's Transition to Investigator

In January 2006, plaintiff was reassigned from undercover police officer to investigator. Id. ¶ 5; ECF Docket # 54, Ex. 14, Plaintiff's Deposition ("Pl. Dep.") at 19. Investigators in the Firearms Investigation Unit investigate gun trafficking in New York City and generate cases by collaborating with undercover police officers and confidential informants. Pl.'s 56.1 Stmt. ¶ 5; Pl. Dep. at 15. Among these investigators, plaintiff was the only female, and one of only a few

---

[1] The following factual backdrop is adapted, in part, from the parties' Local Civil Rule 56.1 statements. A significant portion of plaintiff's responses in her Rule 56.1(b) Statement ("Pl. R. 56.1") to defendants' Rule 56.1(a) Statement ("Def. R. 56.1"), are unresponsive and recite generalizations and citations to large portions of the record without specificity to controvert otherwise specific facts. The Court "deem[s] admitted" defendants' Statement to the extent that plaintiff failed to "specifically controvert[]" any of defendants' "correspondingly numbered paragraph[s]." See Local Civil Rule 56.1(c).

minorities. According to plaintiff, her colleagues consisted of thirteen Caucasian males, and a few African-American males. ECF Docket # 54, Ex. 2; ECF Docket # 52, Def.'s Ex. B, at 35. There were also approximately ten undercover police officers, including five African-American males, four Hispanic males, and one Hispanic female. See ECF Docket # 54, Ex. 2, Ex. 8 at 2. Plaintiff's supervisors, defendants Captain James Coan, Lieutenant Daniel Davin, and Sergeant Patrick Acri, are Caucasian men.

### B. Plaintiff's Performance as an Investigator

Plaintiff's first two annual performance reviews were above-average with generally positive comments. Her first evaluation as an investigator, for the period May 2006 through May 2007, was completed by defendant Sergeant Acri and reviewed by defendant Lieutenant Davin. ECF Docket # 54, Pl.'s Ex. 12, Pl.'s Perform. Evals. at 1-2. On a one to five scale (five being the best), plaintiff received mostly "fours" and some "threes." Acri made positive comments about plaintiff's integrity, professionalism, and adherence to guidelines. He also noted that plaintiff "possesses the ability to carry out responsibilities to a successful completion." Id. at 2. Plaintiff's second performance review, conducted by the same supervisors for the period of August 30, 2007 through August 27, 2008, was more positive. Plaintiff received "fours" across the board, with the overall comment, "Det Lawson exhibits sound judgment and is a dedicated part of the team." Id. at 2. A second set of comments from Davin complimented plaintiff's undercover experience: "Det. Lawson is an asset to the unit when conducting undercover gun buy operations. Det. Lawson is an experienced undercover detective and is an excellent ghost when conducting operations." Id. at 3.

Plaintiff had difficulty generating new cases as an investigator. Pl.'s 56.1 Stmt. ¶¶ 8-10. Investigators build new cases by collaborating with undercover police officers and confidential

3

informants, a process subject to oversight by Department supervisors. Id. ¶ 2. Plaintiff asserts that because she was always out in the field with the undercover police officers, she had less opportunity to seek confidential informants on her own. Pl. Dep. at 101-02. She believes this put her at a disadvantage because her white, male colleagues "could stay back" and "had the opportunity to do other investigations." Pl. Dep. at 16, 19, 102. Plaintiff also complains that she was never assigned any confidential informants. Pl. Dep. at 16.

Investigators also get leads through the distribution of Kite assignments, which involve investigations of "anonymous allegations that someone might be selling guns." Davin Dep. at 126; see also Pl.'s 56.1 Stmt. ¶ 2; Coan Dep. at 55. During plaintiff's three years as an investigator, she received two Kite assignments from her supervisors. She received her first Kite assignment in June of 2007, but was unable to close it because she was on vacation. Id. at 83. She received her second assignment in June 2008, but it was taken away from her one month later, after her supervisors determined that she was making errors and inadequate progress. Id.; ECF Docket # 52, Defs' Ex. F, Mem. to Def. Acri; P's R. 56.1 Stmt ¶ 10. Plaintiff testified that her colleagues received an average of two or three Kite assignments in a matter of months. Pl. Dep. at 79-82.

There is evidence, from early on, that plaintiff was found to be more valuable and talented in an undercover role than as an investigator. In January 2007, about one year after plaintiff was reassigned, Inspector Thomas DiRusso sent a memorandum to the Chief of Organized Crime Control requesting plaintiff's transfer back to undercover detective status. ECF Docket # 54, Pl's Ex. 2. DiRusso explained that plaintiff's "value to [the Firearms Investigation Unit] as an undercover detective cannot be measured." Id. He described that as a female undercover, plaintiff was able to diffuse otherwise tense gun-buying scenarios, which

4

greatly improved the safety of the other undercover officers. Id. DiRusso also acknowledged that plaintiff's activity as an investigator had been low until that point—she had made no arrests and had not debriefed any perpetrators or testified as an investigator in court. Id.

In August of 2008, plaintiff had several meetings with her supervisors and was informed that if she did not "start more cases" or "pick up her activity" by November 25, 2008, she would lose her overtime. Pl.'s 56.1 Stmt. ¶ 8. At the time, plaintiff claims she had "capped out" on overtime, meaning she was hitting the maximum of 45 hours of overtime per month. Pl. Dep. at 97. But plaintiff's performance did not improve by the end of November; she did not have any arrests, search warrants, confidential informants or cases. Pl.'s 56.1 Stmt. ¶ 9.

Plaintiff's substandard performance of her investigative duties is documented in a "Counseling Memorandum" dated December 29, 2008, from Firearms Investigation Unit Supervisor, Sergeant Donald Morgan. The memo highlights the deficiencies in plaintiff's performance, including issues with plaintiff's Kite investigations, source development, and overall activity, and makes suggestions for how she can improve.[2] ECF Docket # 52, Defs' Ex. E; Pl.'s 56.1 Stmt. ¶¶ 10-11. Although Sergeant Morgan acknowledged plaintiff's "excellent" ghosting skills and "above average" surveillance techniques, he emphasized that plaintiff's "skills must be well rounded." Id.

Defendants' issues with plaintiff's performance are also documented in an "interim" performance review for the period of October 22, 2008 through January 5, 2009. This review was notably less positive, with an overall evaluation of 3.5, including 0's and many 3's in skill-

---

[2] Plaintiff disputes the authenticity of the "Morgan Memorandum." See Pl.'s 56.1 Stmt. ¶ 10-11. She does not, however, challenge the veracity of the memo's content, as it is admitted in other parts of the Rule 56.1 Statement.

related areas, which were balanced out by 5's and 4's in areas involving integrity, professionalism, interpersonal skills and fitness. The general rater's comments stated,

> "Det. Lawson has not exhibited the proper skillset which is required to be a productive member of the Firearms Investigations Unit. Her activity has been below standards as compared to her peers. Det. Lawson is willing to perform certain investigative tasks, however it is her capabilities which are lacking. Det. Lawson has been very effective at ghosting and surveillance duties. It is recommended that she be transferred to another assignment which may assist her in developing her investigative skills."

ECF Docket # 54, Pl.'s Ex. 12, Pl.'s Perform. Eval. at 9-10.

### C. Overtime Reduction and Transfer

By way of memorandum dated December 19, 2008, the FIU Module Leader requested plaintiff's transfer "to a less challenging assignment within the Firearms Suppression Division or another unit in the Organized Crime Control Bureau." ECF Docket # 54, Defs' Ex. G, Dec. 19, 2008 Memorandum. The memo cited plaintiff's difficulty completing her duties as an investigator, noting that plaintiff had not signed up a confidential informant over the preceding 13 months and had failed to complete the two Kite investigations assigned to her. Id.

In a meeting on January 5, 2009, defendant Captain Coan offered plaintiff the choice to transfer to either the Narcotics, Vice, or Gun Monitoring Divisions within the Organized Crime Control Bureau. Pl.'s 56.1 Stmt. ¶ 12. Coan told plaintiff that FIU was "too advanced" for her and attempted to relate the "square peg in a round hole" analogy to describe plaintiff's incompatibility with the unit. Pl. Dep. at 94. When plaintiff declined to choose, she was reassigned to the Gun Monitoring Unit on January 9, 2009. Pl.'s 56.1 Stmt. ¶ 13; Pl. Dep.108; ECF Docket # 54, Pl's Ex. 1, Amended Complaint ("Compl.") ¶ 75. She remains employed there today. The transfer did not affect plaintiff's salary, which remained around $87,000

annually, but she claims she continued to be restricted with respect to overtime compensation. Pl.'s 56.1 Stmt. ¶ 14. Sometime within the first year at GMU, plaintiff's annual salary increased to $116,000 annually. Id. ¶ 14; Pl. Dep. at 12-13.

### D. Plaintiff's Conflict with Supervisors

Plaintiff points to a few isolated conflicts with her supervisors during her three years as an investigator. In June of 2008, Lieutenant Davin allegedly interfered with plaintiff's second Kite assignment by "complaining" when plaintiff requested to change her scheduled tour to complete her investigation. Pl. Dep. at 84. Plaintiff argues that "[h]e had never done that to any other white, male investigators." Id.

Plaintiff also believes that various officers demonstrated disregard for her safety. She points to an incident on July 1, 2006, when Lieutenant Dave Siev ordered plaintiff and a black, male undercover officer to work a detail in police uniform. Id. at 20. Plaintiff asserts that this created a "safety issue" because both had done undercover work, and there was a risk that they would be recognized as police officers. Pl. Dep. at 20-21. Plaintiff contacted her Union delegate about the issue and was removed from the detail after the delegate spoke to plaintiff's Commanding Officer. Id. at 21. Two weeks later, plaintiff was reprimanded for getting a union delegate involved. Id.

On the second occasion, Davin ordered plaintiff to wear an artillery vest during the execution of a search warrant. Id. at 70-71. Plaintiff believes this created a "safety issue" because the vest is made for "a thick man" to wear during an entry for a search warrant, and it was very heavy on her, as a "small-framed woman." Id. at 71. Because of the incident, plaintiff concluded that "Lieutenant Davin [was] very racist, when it comes to [her] safety." Id.

### E. Procedural History

Plaintiff filed a complaint of employment discrimination with the NYPD's Office of Equal Employment Opportunity ("OEEO") on January 20, 2009, but the NYPD determined that her claims were unfounded. Pl.'s 56.1 Stmt. ¶ 17; ECF Docket # 52, Defs' Ex. I. Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on June 5, 2009 and received a Right to Sue Letter in August of 2010.[3]  See ECF Docket # 52, Defs' Ex. L, EEOC Charge; Compl. ¶ 7.

The gravamen of plaintiff's complaints is that her supervisors treated her differently than they treated her white, male colleagues. She also complained that despite strong performance reviews, she was effectively "demoted in salary, benefits, status and duties" when she was transferred to GMU, and she believes this was "motivated by [her] race and sex." Id.

Plaintiff filed this lawsuit on November 12, 2010. She brings an assortment of claims under Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, New York State Executive Law § 296, and New York City Administrative Code § 8-107. Plaintiff's claims include race discrimination, gender discrimination, retaliation, hostile work environment, and failure to promote, as applicable under each of the aforementioned statutes.

## II. DISCUSSION

### A. Summary Judgment

The Court may grant summary judgment when the movant shows that there is no genuine dispute over a material fact and he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movants bears the burden of demonstrating the absence of a material factual question; in making this determination, the court must view all facts "in the light most favorable"

---

[3] We assume plaintiff received a right to sue letter from the EEOC, though it is not in the record.

to the non-moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). But the movant may discharge its burden by demonstrating that there is insufficient evidence to support the opposing party's claim, for which it bears the burden of proof at trial. Id. at 322-23.

Once the moving party has adduced facts demonstrating that the opposing party's claims cannot be sustained, in order to survive the summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed.R.Civ.P. 56(c)(1). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted); see also FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) ("[T]he non-moving party must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.") (citation and internal quotation marks omitted).

Although disputes over one party's intent usually preclude summary judgment, a plaintiff cannot rely on "the mere incantation of intent . . . as a talisman to defeat an [employer's] otherwise valid motion." Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (granting summary judgment to employer on Title VII claim). "Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations" to proceed to trial. Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). To allow otherwise "would necessitate a trial in all Title VII cases." Meiri, 759 F.2d at 998.

## B. Exhaustion of Administrative Remedies

As an initial matter, defendants argue that plaintiff's failure to promote claims should be dismissed because they were not alleged in plaintiff's EEOC charge. We disagree.

9

Although a plaintiff must exhaust administrative remedies before filing a Title VII action, the Second Circuit has recognized that "claims that were not asserted before the EEOC may be pursued in subsequent federal court action if they are *reasonably related* to those that were filed with the agency." Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 686 (2d Cir. 2001) (emphasis added). "A claim is considered reasonably related if the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge that was made." Fitzgerald v. Henderson, 251 F.3d 345, 359-60 (2d Cir. 2001) (quoting Butts v. City of N.Y. Dept. of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993)).

Plaintiff's failure to promote claim is not a "wholly different type of discrimination." Warshun v. N.Y. Cmty. Bancorp, Inc., 2013 WL 3967563, at *8 (E.D.N.Y. 2013) (Spatt, J.) (quoting Peterson v. Ins. Co. of N.A., 844 F. Supp. 107, 109-10 (S.D.N.Y. 1995)). Her EEOC complaint addressed performance reviews, plaintiff's transfer, and alleged discriminatory treatment by supervisors. Plaintiff's failure to promote claim is based on the same allegations of race and gender discrimination that underlie her EEOC claims. See Holtz v. Rockefeller, 1999 WL 1043866, at *3 (S.D.N.Y. 1999), *aff'd in relevant part*, 258 F.3d 62, 83-84 (2d Cir. 2001) (holding that failure to promote claim is reasonably related to failure to train because it was "reasonable to suspect that the EEOC, in investigating [plaintiff's] complaint of failure to train would have assessed [defendant's] promotion and transfer policies"); Gutierrez v. City of New York, 756 F. Supp. 2d 491, 499 (S.D.N.Y. 2010) (finding failure to promote claim reasonably related to denial of overtime and transfer requests). Accordingly, we find plaintiff's failure to promote claim reasonably related to the claims in plaintiff's EEOC complaint and deny defendants' motion to dismiss that claim for failure to exhaust administrative remedies.

## C. Title VII Standard

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin." M.O.C.H.A. Society, Inc. v. City of Buffalo, 689 F.3d 263, 273 (2d Cir. 2012) (citing 42 U.S.C. § 2000e–2(a)(1)). Claims brought under Title VII are analyzed under the burden-shifting framework that the Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Lugo v. City of N.Y., 518 Fed. App'x 28 (2d Cir. 2013). "Plaintiff can avoid dismissal by presenting the 'minimal' prima facie case, . . . [which] requires no evidence of discrimination." Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (quoting James v. New York Racing Ass'n, 233 F.3d 149, 153-54). Plaintiff must show that (1) she belongs to a protected class; (2) she was qualified for this job; (3) she suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances that give rise to an inference of discrimination. Gorzynski v. Jetblue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010).

Once plaintiff states a prima facie case, the burden shifts to defendant to give a legitimate, non-discriminatory reason for its action. Plaintiff then loses the presumption of discrimination gained by making a prima facie case and "must then come forward with evidence that the defendant's proffered, non-discriminatory reason is mere pretext for actual discrimination." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000). "[T]o defeat summary judgment, . . . plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Govori v. Goat Fifty, L.L.C., 519 Fed. App'x 732, 734 (2d Cir. 2013). Title VII retaliation claims are subject to the

same burden-shifting analysis. <u>Broich v. Inc. Village of Southampton</u>, 462 Fed. App'x 39, 44-45 (2d Cir. 2012).

It is undisputed that as an African-American woman, plaintiff belongs to two protected classes, and that she was at least minimally "qualified" for her job. Accordingly, to establish a prima facie case, plaintiff must show that she was subject to an adverse employment action under circumstances giving rise to an inference of discrimination. For the reasons stated below, plaintiff fails to do so. But even if plaintiff could meet this modest threshold burden, the record does not support the inference that plaintiff's race or sex played a role in defendants' employment decisions.

### D. Adverse Employment Action

Defendants argue that plaintiff has not established an adverse employment action. Plaintiff's central accusation is that her transfer to the Gun Monitoring Unit and the related reduction in overtime payments were motivated by race and gender discrimination. Pl's 51.6 Stmt. ¶ 14. We cannot agree based on the record before us.

"A plaintiff sustains an adverse employment action if [s]he . . . endures a 'materially adverse change' in the terms and conditions of employment." <u>Galabya v. N.Y. City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000) (citing <u>Richardson v. N.Y. State Dep't of Corr. Serv.</u>, 180 F.3d 426, 446 (2d Cir. 1999)). "To be 'materially adverse,' a change in working conditions must be 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" <u>Id.</u> (quoting <u>Crady v. Liberty Nat'l Bank and Trust Co.</u>, 993 F.2d 132, 136 (7th Cir. 1993)). A materially adverse change must "affect employment in a way that is both detrimental and substantial." <u>Weeks v. N.Y. State</u>, 273 F.3d 76, 87 (2d Cir. 2001), *abrogated on other grounds by* <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 535 U.S. 101, 122 (2002). Examples of materially adverse changes

include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quoting Galabya, 202 F.3d at 640).

### 1. Overtime

The denial of overtime hours or pay on the basis of race or sex violates Title VII. Little v. Nat'l Broad. Co., Inc., 210 F. Supp. 2d 330, 373 (S.D.N.Y. 2002) (acknowledging that plaintiff satisfies the standard for adverse employment action where he produced evidence of actual loss in income due to lost overtime even though he remained at the same level of pay); Robinson v. Goulet, 2013 WL 2123723, at *2 (2d Cir. 2013) (summary order) ("The loss of overtime hours or pay on the basis of race violates Title VII."). But an employer's decision to reduce or suspend overtime benefits does not always equate to an adverse employment action. See Brown v. City of Syracuse, 673 F.3d 141, 150-51 (2d Cir. 2012) (finding that loss of overtime corresponding to suspension with pay is not a materially adverse employment action when the employer merely enforces its preexisting disciplinary policies in a reasonable manner); Como v. O'Neill, 2002 WL 31729509, at *2 (S.D.N.Y. 2002) (finding no adverse employment action where plaintiff's ability to collect overtime was obviated for a short period of time during his transfer to another office); Lockhart v. Hofstra Univ., 123 Fed. App'x 31, 33 (2d Cir. 2005) (finding that plaintiff's unsupported assertions regarding his overtime did not meet his burden of proving an adverse employment action).

Plaintiff claims that she was "capping out" on overtime, putting in an extra 40 to 45 hours per month. Pl. Dep. at 97. But plaintiff has not quantified how often she "capped out" or the

13

extent of the detrimental impact of defendants' actions.   In fact, she admits that her overtime was never formally suspended:

> Q: Okay.  But when was the first time, do you remember, when they told you [that] you cannot do any more overtime?
>
> A: I wasn't told I couldn't – they didn't tell me directly, "You can't do the overtime."

(Pl. Dep. at 98:23-99:1).

> and
>
> Q: Do you recall the date when you first stopped doing any overtime?
>
> A: It would have – it was like the following week.  After this meeting, the following week, I was being sent home.
>
> Q: Okay.
>
> A: First it started off, where "Debbie" – If I did a 2:00 to 10:00 Lieutenant Davin would come in and say, "Debbie, 12:00 is your cutoff," so my hours are dropping. It went from four hours, to two hours, to sometimes one hour, to being sent home.

(Pl. Dep. at 99:2-12).

Drawing all inferences in plaintiff's favor, we would agree that suspending or materially reducing plaintiff's benefits from 40-45 hours per month would qualify as an adverse employment action.[4]  However, we do not have enough evidence to make that finding. According to plaintiff's vague testimony, her ability to collect overtime was subject to increased discretion by her supervisors on an ongoing basis.  But plaintiff has failed to proffer any record of a suspension or reduction in her overtime benefits that would allow us to find in her favor.

---

[4] Assuming a standard work-week of 40 hours and payment commensurate with the additional time worked, the shift from 40-45 hours of overtime to zero would amount to a minimum compensation reduction of 25 percent per month.  An action that takes away this supplemental income, for an extended period of time, would satisfy the standard for a materially adverse employment action.

Plaintiff also asserts that her overtime "was affected" by her transfer to the Gun Monitoring Unit on January 9, 2009. But once again, plaintiff fails to substantiate her claim with any numbers or records. On the other hand, we do know that plaintiff's salary remained at $87,000 annually when she was transferred, and at some point during her first year at GMU her base salary increased by approximately 33 percent to $116,000 per year. Pl.'s 56.1 Stmt. ¶ 14; Pl. Dep. at 12-13. In this context, we cannot say that any reduced overtime opportunity associated with the transfer to the Gun Monitoring Unit was a materially adverse employment action. To the extent that we could possibly make that finding, plaintiff has not set forth any evidence satisfying her burden of proof. See Lockhart, 123 Fed. App'x. at 31 ("[P]laintiff cannot meet [her] burden through reliance on unsupported assertions."). Plaintiff's deposition testimony regarding her compensation after the transfer is not helpful in this regard and also suggests that plaintiff still had the ability to collect overtime:

Q: And you also receive overtime; is that right, or you can receive overtime?

A: What are you talking about? Am I receiving overtime now?

Q: As a second-grade detective, you can receive overtime?

A: Well, it varies.

Q: But have you ever received overtime?

A: I have, yes.

Q: And that was as a second-grade detective?

A: Yes.

(Pl. Dep. at 12:8-16). Because we do not know *how* plaintiff's overtime was affected in the Gun Monitoring Unit, we cannot find a materially adverse employment action. To the extent that

plaintiff gets paid 33 percent more for working 40 to 45 fewer hour per month, the transfer appears, on this record, to have been a favorable employment action.

2. *Transfer to the Gun Monitoring Unit*

The parties also dispute whether plaintiff's transfer to the Gun Monitoring Unit itself is actionable. "[A] transfer is an adverse employment action if it results in a change in responsibilities so significant as to constitute a setback in the plaintiff's career." Galbaya, 202 F.3d at 641 ("to be adverse, change in work assignment must cause materially significant disadvantage.") (internal quotations and citations omitted). In comparison, "a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." Id. at 641 (quoting Williams v. Bristol-Meyers Squibb Co., 85 F.3d 270, 274 (7th Cir. 1996)).

With respect to the change in duties, plaintiff has the burden of raising a genuine issue of material fact suggesting "that her assignment to an admittedly equally paying and comparable job was materially less prestigious, materially less suited to her skills and expertise, or materially less conducive to career advancement." Cater v. New Venture Gear, Inc., 310 Fed. App'x 454, 457 (2d Cir. 2009) (alterations and citation omitted). Plaintiff fails to do so.

Plaintiff does not argue that the Gun Monitoring Unit is less prestigious or that she is dissatisfied with her new duties. There is no evidence that her title changed: she remained a Detective, Second Grade. Instead, plaintiff argues that she "will likely never be promoted to Detective First Grade as the nature of this assignment is not an investigative track." Pl's 56.1 Stmt. ¶ 14. However, this assertion is unsupported and even contradicted by the record. As an initial matter, plaintiff's performance review for January 9, 2009 through December 31, 2009—after her transfer to the Gun Monitoring Unit—lists her primary assignment as "Investigative"

and comments on plaintiff's work in an investigative capacity. See ECF Docket # 54, Pl.'s Ex. 12, Pl.'s Perform. Evals., at 9-10.

But if plaintiff was, in fact, "demoted" from her position as an investigator, there is no evidence that the investigative track increases the likelihood of a future promotion to Detective First Grade. See ECF Docket # 54, Pl's Ex. 3, List of Promotions in Firearms Suppression Division. For example, between 2006 and 2010, six employees were promoted to Detective, First Grade in the Firearms Suppression Division—three undercover police officers, two investigators, and one undercover police officer who had recently been reassigned as an investigator. Id. Furthermore, the majority of these promotions were awarded to minorities (two African-American and two Hispanic, compared to two Caucasian). Id. We find no information in the record that substantiates plaintiff's assertion.

### E. Inference of Discrimination

Even assuming that plaintiff could meet her burden of showing an adverse employment action, the record does not support an inference of discrimination.

#### 1. Gender Discrimination

At the outset, we dismiss plaintiff's claim of gender discrimination. The fact that plaintiff was a woman and her colleagues were men is not enough to raise an inference of discrimination. Plaintiff points to one instance of possible gender-insensitivity, when she was forced to wear a heavy artillery vest that she claims is made for a man during the execution of a search warrant. But plaintiff does not go so far as to suggest that this implicated gender discrimination. Instead, she commented that, "Lieutenant Davin [was] very *racist*, when it comes to [her] safety." Pl. Dep. at 71 (emphasis added).

Plaintiff also mentioned that during the August 12, 2008 meeting regarding her transfer, defendants commented that it would be good for her because she could "transfer closer to home for her children." ECF Docket # 54, Pl. Ex. 17, Def. Acri Dep. at 62. Plaintiff alleged that this comment is "sexist" because the fact that she is a parent "never interfered with her job." Id. at 63. Plaintiff "must do more than merely proffer [her] own belief that [s]he was discriminated against" to raise an inference of discrimination. Dawkins v. Witco Corp., 103 F. Supp. 2d 688, 697 (S.D.N.Y. 2000).

Accordingly, defendants' motion for summary judgment as to plaintiff's gender discrimination claims is GRANTED.

### 2. Race Discrimination

Plaintiff does not point to a single incident of name-calling or overt hostility directed at her explicitly because of her race. In fact, she admits that defendants never made a derogatory statement about her race or her gender.[5] ECF Docket # 52, Defs' Ex B, Pl's Dep. at 118. But despite the lack of any direct evidence of discriminatory animus, plaintiff believes that discrimination *could* be inferred from the way she, and other minorities, were treated in the Firearms Investigation Unit.

A plaintiff may raise an inference of discrimination "by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated

---

[5] Plaintiff offers the deposition testimony of a male, black undercover officer, known as "UC 7988," who also filed an internal complaint with the NYPD's Office of Equal Employment Opportunity. See ECF Docket # 54, Pl's Ex 21, at 39. He testified, in relevant part: Davin "treat[ed] the black officers different than they [sic] treat the white officers," and referred to one incident in which Davin called an African-American man a "nigger" during the execution of a search warrant. Id. UC 7988 also testified to the content of his OEEO Complaint, in which he stated "Sergeants Acri and Morgan has [sic] told me I couldn't do certain things that other detectives do who happen to be white as per Lieutenant Davin." Id. at 40-41. When asked why he thinks Davin has animus toward people of color, he responded, "The way he conducts himself in the street, his actions, the way he talks to people. . . He will curse a person of color out like there's no tomorrow, like it's no big deal, and disrespect them." Id. at 58.

However, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).

employee outside of his protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (citing Int'l Bd. of Teamsters v. United States, 431 U.S. 324, 355 n. 15 (race discrimination) and Shumay v. United Parcel Serv. Inc., 118 F.3d 60, 63 (2d Cir. 1997) (gender discrimination)). Although plaintiff alleges that she was not treated the same as her colleagues, she does not show that she was treated less favorably, or that any adverse employment actions occurred under circumstances giving rise to an inference of race discrimination.

First, with respect to the alleged reduction in overtime, plaintiff suggests that the Caucasian, male employees were not subject to the same restrictions. See Pl. Dep. at 97 ("But I can tell you that male investigators were staying every day, making their overtime, and I was being sent home by [defendants]."). But plaintiff has not set forth any evidence regarding her Caucasian, male colleagues' overtime compensation. Nor is there any suggestion that her colleagues, whose overtime supposedly went unrestricted, were "similarly situated" and received overtime benefits irrespective of their performance.

The record also contains strong evidence that race and gender were not a factor with respect to plaintiff's transfer to the Gun Monitoring Unit. Plaintiff was replaced at the Firearms Investigation Unit by a black woman—someone of the same race and gender. Pl. Dep. at 35-36. Furthermore, plaintiff was transferred out of FIU at the same time as Detective Joseph Collura— a white male, who defendants also identified as having low activity (coincidentally higher than plaintiff's). ECF Docket # 54, Defs' Ex. G, Dec. 19, 2008 Memorandum. Given this information, we are hard-pressed to find an inference of discrimination. See Montanile v. Nat'l Broad. Co., 211 F. Supp. 2d 481, 487 (S.D.N.Y. 2002) ("That a plaintiff is replaced by another in the same protected class weighs heavily against the inference that she suffered discrimination."); Estepa v. Shad, 652 F.Supp. 567, 571 n. 5 (E.D.N.Y.1987) (Platt, J.) ("[A]bsent other facts from

which inferences may be drawn, unless a Title VII plaintiff is replaced by a member of a nonprotected class, proof of intentional discrimination appears extremely difficult, if not practically impossible.").

Despite the dearth of evidence of discriminatory animus, plaintiff asks this Court to consider the possibility that she was "set up to fail." See ECF Docket # 57, Letter pursuant to the Court's Order, April 19, 2003. In sum and substance, plaintiff argues that she was effectively treated as an undercover police officer, and that because of this alleged disparate treatment— which *may* be because of her race or gender—plaintiff was unable to fulfill her role as an investigator. See ECF Docket # 52, Pl.'s Mem. at 12 ("Plaintiff can establish . . . that she *may* have been treated differently due to her race or gender."). But after a close review of the record and a concerted attempt to piece together plaintiff's scant evidentiary support for this argument, we conclude that no rational jury could find in her favor.

As an initial matter, the roles of investigator and undercover police officer appear to be somewhat intertwined in that they collaborate as a team within the Firearms Investigations Unit. Surveillance or "ghosting" is also performed in both capacities. See Davin Dep. at 38, 103, 107; Acri Dep. at 19-20; 102-103; ECF Docket # 54, Pl.'s Ex. 12, Pl.'s Perf. Evals. at 5, 7. The key distinction appears to be that undercover police officers make undercover purchases of firearms, and investigators are responsible for generating new cases. There also seems to be a general understanding that it would violate unofficial department policy for investigators to purchase firearms or ride in vehicles with undercover police officers because of the attendant safety concerns—namely that an investigator might be recognized and place all officers present in great peril. See Coan Dep. at 47; Acri Dep. at 30-32, 35; Davin Dep. at 125-25.

Plaintiff argues that she was ordered to "operate as an undercover" because she continued to ride with the black undercover police officers and purchase firearms in violation of Department policy. But most notable about the record is what it *does not* contain: Any specificity, whatsoever, about this undercover activity that supposedly displaced plaintiff's investigative duties. We would suspect that if plaintiff was truly acting in a "dual capacity," in violation of department policy, she would have significant, credible evidence of firearm or drug purchases during her three years as a Firearms Investigation Unit investigator, as well as testimony from other undercover police officers suggesting that she was riding in vehicles with them on a consistent basis. However, the record reveals nothing of the sort. Plaintiff has failed to offer any approximate dates of firearm purchases, much less testimony of anyone who could verify her assertion. The scintilla of evidence available suggests only that there may have been an isolated incident or some overlap with another Unit within the NYPD at some point in early 2006. For example, UC 7988 testified without offering any specificity:

> Q: Based upon your experiences as an undercover, as an investigator, did she (plaintiff) buy any guns?
>
> A: Yes.
>
> Q: Is that a violation of department policy?
>
> A: For her buying guns as an investigator, yes.

(ECF Docket # 54, Pl.'s Ex. 21, at 74).

Defendant Davin also gave ambiguous testimony:

> Q: Do you know if she was ever undercover while in FIU?
>
> A: Yes. One time.
>
> Q: When was that?

21

A: Prior to my supervising.

and

Q: If she was an investigator in 2006, should she have been doing undercover buys?

A: No.

(ECF Docket # 54, Pl.'s Ex. 16, at 123-24.

But perhaps most convincing is the fact that plaintiff herself does not come forth with any specific evidence. Plaintiff submitted an exhibit consisting of her cryptic notes and a few short-hand activity reports, which are incomprehensible to this Court. See ECF Docket # 54, Exs. 8, 10. Although counsel suggested, at oral argument, that these documents support plaintiff's assertion that she was purchasing guns and riding in vehicles with various anonymous undercover officers, plaintiff makes no effort to decode her notes or use them as evidence in support of her argument. See ECF Docket # 54, Ex. 8. We decline to do so.

However, plaintiff's notes do suggest that her supervisors made an effort to cut off any continued gun purchases, and that plaintiff was displeased about it. According to plaintiff's notes on July 24, 2006, she received a call from a supervisor of the Manhattan District Attorney's Office of the Homicide Investigation Unit, who informed plaintiff that "[she] can no longer buy for [them] because of [her] status change." Plaintiff responded that she was "being punished" for speaking out about a safety issue. See ECF Docket # 54, Ex. 8, at 6.

### F. Legitimate, Non-Discriminatory Reasons and Pretext

Even if plaintiff could establish a prima facie case of discrimination, she would fall short of establishing that defendants' legitimate, non-discriminatory explanations for their actions were a pretext for discrimination. As an initial matter, plaintiff does not deny that she failed to

perform as an investigator. In that sense, plaintiff actually verifies defendants' legitimate, non-discriminatory reasons for transferring her and restricting her overtime.

With respect to plaintiff's allegation that she was not given a sufficient number of Kite assignments, plaintiff does not dispute that she was unsuccessful on her first two assignments. Plaintiff also complains that she was never given any confidential informants, but there is no evidence in the record that her white, male colleagues were treated more favorably in this regard.

To the extent that plaintiff seeks to blame defendants for failure to train her, she has not set forth any evidence of favorable treatment received by her white, male colleagues. In fact, defendants themselves suggested that plaintiff's transfer would give her the investigative training she needed to be successful. Pl.'s Perf. Evals. at 7. ("It is recommended that [plaintiff] be transferred to another assignment which may assist her in developing her investigative skills."); Coan dep. at 58 ("She was never given the opportunity to go to a unit where they did, like, investigations one on one. And my recommendation . . . was that, perhaps it might have been better had they sent her to Narcotics to do basic investigations . . . because she didn't seem to have the skill sets required of the long-term, major-case type of investigations that we were predominantly performing in the [Firearms Investigation Unit].").

Even if plaintiff was not handed many Kite assignments or confidential informants by her supervisors, she was also responsible for developing cases and recruiting confidential informants on her own, which she unquestionably failed to do. To the extent that plaintiff attempts to justify her inactivity by claiming she "operated as an undercover," there is no evidence in the record suggesting that any gun-purchasing activity was significant or that it prevented her from doing any investigative work.

But perhaps most importantly, plaintiff fails to rebut the significant evidence that race was not a factor in these allegedly adverse employment decisions. The only evidence before this Court suggests that members of non-protected classes were also held accountable for low activity, and that race was not a factor in the awarding of promotions. In light of defendants' logical, legitimate explanation for their actions and the lack of any evidence of similarly situated, non-protected employees receiving favorable treatment, there is no genuine issue of material fact that should preclude summary judgment.

Accordingly, defendants' motion to dismiss plaintiff's race discrimination claims is GRANTED.

### G. Failure to Promote

Despite the undisputed evidence of plaintiff's unsatisfactory performance, plaintiff also claims that she was denied a promotion to Detective, First Grade, for discriminatory reasons. In order to make out a prima facie case for discriminatory failure to promote, plaintiff must show (1) she was qualified for the job for which she applied; (2) she was denied the job; and (3) the denial occurred under circumstances giving rise to an inference of discrimination on a basis forbidden by Title VII. Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000).

There is very little information in the record regarding this claim. We do not know, for example, what the standard is for a promotion to Detective, First Grade. Plaintiff's only support for her apparent belief that she deserved a promotion is that it had been more than two years since her last promotion. ECF Docket # 52, Ex B, Pl.'s Dep. at 119 ("[I]t is usually like a two-year window before they promote you again."). But the mere fact that she believed she was qualified is conclusory and insufficient to survive defendants' summary judgment motion. Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999); Williams v. R.H. Donnelley Corp.,

368 F.3d 123, 126 (2d Cir. 2004) (holding that plaintiff's failure to promote claim fails because plaintiff did not demonstrate that she was qualified for the position she sought).

Moreover, plaintiff has not set forth any evidence that the failure to promote her was discriminatory. She also admits that since 2005, at least two women and three African-American employees were promoted to First Grade in the Firearms Investigation Unit, an apparently small division consisting of only twelve employees while plaintiff worked there. Pl.'s 56.1 Stmt. ¶ 35. Furthermore, when asked during her deposition to name other employees who were promoted before her, plaintiff recalled one white male, one Hispanic female, and one black male. An inference of discrimination cannot be found in the record before us.

Defendants' motion for summary judgment as to plaintiff's failure to promote claim is GRANTED.

## H. Hostile Work Environment

We also find that plaintiff has not demonstrated that she was subject to a hostile work environment. "A hostile work environment claim requires a showing (1) that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer." Augustin v. The Yale Club of New York City, 274 Fed. App'x 76 (2d Cir. 2008) (quoting Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002). Plaintiff must demonstrate that "under the totality of the circumstances, the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered." Id. (quoting Alfano, 294 F.3d at 373). The conduct

must create an "objectively hostile or abusive environment, and the victim must "subjectively perceive the environment to be abusive." Alfano, 294 F.3d at 373.

Plaintiff simply cannot meet this burden. The incidents that plaintiff cites regarding alleged harassment by her supervisors were, at worst, insensitive, but race and gender-neutral. Facially neutral incidents may be sufficient to establish a hostile work environment claim, but it requires some basis for inferring that the incidents race-neutral on their face were in fact discriminatory. Fleming v. MaxMARA, Inc., 644 F. Supp. 2d 247, 262-263 (E.D.N.Y. 2009) (Sifton, J.) (quoting Alfano, 294 F.3d at 378). Plaintiff has not satisfied this burden of proof. Nor are the incidents severe or pervasive enough to meet the standard for a Title VII hostile work environment claim.

Plaintiff's claim also fails under the CHRL standard. Although the CHRL does not impose a "severe or pervasive" bar, plaintiff must still link the adverse employment action to a discriminatory motivation, and where plaintiff fails to do so, her claim fails. Williams v. New York City Hous. Auth., 61 A.D. 3d 62 (1st Dept. 2009). For the reasons stated above, plaintiff has not set forth sufficient evidence to meet this burden.

Accordingly, defendants' motion for summary judgment as to plaintiff's hostile work environment claim is GRANTED.

## I.  Retaliation

Finally, we dismiss plaintiff's claim of discriminatory retaliation. Title VII retaliation claims are analyzed according to the burden-shifting framework set forth in McDonnell Douglas Corp v. Green, 411 U.S. 792 (1973). Plaintiff must first establish a prima facie case of retaliation by showing: "(1) participation in a protected activity known to the defendant; (2) an employment action disadvantaging the plaintiff, and (3) a causal connection between the

protected activity and the adverse employment action." <u>Quinn v. Green Tree Credit Corp.</u>, 159

F.3d 759, 769 (2d Cir. 1998) (quoting <u>Tomka v. Seiler Corp.</u>, 66 F.3d 560, 577 (2d Cir. 2000)).

Plaintiff cannot establish a prima facie case of retaliation because she cannot prove a

causal connection between the protected activity and the adverse employment action. Plaintiff

was informed about changes to her overtime at the end of 2008. She was informed of her

transfer on January 5, 2009, and it was finalized on January 8, 2009, before she filed her OEEO

complaint on January 20, 2009 and EEOC complaint on June 5, 2009. Accordingly, there is no

evidence that the allegedly adverse employment actions were caused by plaintiff's protected

activity.

Plaintiff also suggests that the negative interim performance review that she received in

January qualifies as retaliation. However, there is no evidence that this review was performed

after plaintiff filed her internal OEEO complaint on January 20, 2009. Even if it was, there is no

evidence that the review itself disadvantaged plaintiff, since her transfer and alleged overtime

restrictions had already been finalized.

Accordingly, defendant's motion for summary judgment as to plaintiff's retaliation claim

is GRANTED.

### III. CONCLUSION

Whether real, imagined or suspected, Ms. Lawson's belief that she has been the victim of

discrimination does not counter defendants' application. She may not substitute accusation and

summary conclusions for hard evidence. While we must always scrutinize the record before us

as evidence of possible discrimination rarely if ever appears in obvious ways, plaintiff has been

unable to uncover evidence to support her claims or identify a genuine issue of material fact.

Ms. Lawson complains that she has lost money as a result of the defendants' discrimination, yet that easily demonstrable fact is unsupported by readily available evidence. She insists her career has suffered a crippling blow at the hands of her supervisors and that her prospects for further promotion have been destroyed, but the evidence strongly suggests otherwise. Accordingly, the Court is constrained to grant the defendants' motion for summary judgment.

The Clerk is directed to enter judgment for defendants.

SO ORDERED.

Dated: Brooklyn, New York
November 2/, 2013

s/Raymond J. Dearie

RAYMOND J. DEARIE
United States District Judge